

FILED

MAY 27 2008

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **CITY OF SAN ANTONIO** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CIVIL NO. SA-06-CA-381-OG** |
| | ) | |
| **HOTELS.COM, et al** | ) | |
| | ) | |
| **Defendants** | ) | |

## Memorandum and Opinion on Class Certification
## [SEALED]

This lawsuit was brought by the City of San Antonio, on behalf of itself and other Texas

cities similarly situated, for collection of unpaid hotel occupancy taxes.[1]  Plaintiff alleges that

Defendants, which are all web-based hotel booking companies, have a duty to collect and pay

hotel occupancy taxes.  Plaintiff seeks money damages as the result of Defendants' alleged

violations of state and local laws which govern the collection and payment of hotel occupancy

taxes.  A claim for conversion is also asserted.  (Dkt. # 74).  The Court has jurisdiction over this

matter pursuant to 28 U.S.C. § 1332(d).  Venue is proper in this district pursuant to 28 U.S.C. §

1391(a)(2).

On August 29, 2006, Plaintiff filed its motion for class certification (Dkt. # 45).

Defendants filed a response (Dkt. # 55, 56) and Plaintiff filed a reply (Dkt. # 59).  Plaintiff

amended its complaint on October 31, 2006 (Dkt. # 74) and supplemented its motion on

---

[1]There are similar lawsuits pending in other states (including Illinois, Ohio, North Carolina, South Carolina and Indiana) and other cities (including Atlanta, Philadelphia, Los Angeles and San Diego).  Dkt. # 45, p. 10.

248

November 6, 2006 (Dkt. # 88).  The Court determined that discovery on class certification issues was necessary, and the parties engaged in rather extensive pre-certification discovery.  At the end of the discovery period, Plaintiff filed a brief in support of its supplemental motion (Dkt. # 152) and Defendants filed their opposition to Plaintiff's supplemental motion for class certification (Dkt. # 163, 164).  On May 15, 2007, Plaintiff filed its second supplemental brief in support of class certification (Dkt. # 190).

On May 16-17, 2007, the Court held an evidentiary hearing on the motion for class certification.  The Court heard evidence and legal arguments from all parties and, in the interest of judicial economy, allowed certain evidence to be presented by submission.  After the hearing, Plaintiff filed its post-hearing brief in support of its supplemental motion for class certification (Dkt. # 217, 218) and Defendants filed their post-hearing brief in opposition thereto (Dkt. # 220).  The parties' experts, who testified at the class certification hearing, were also permitted to supplement their reports.  Their supplemental and rebuttal reports were filed along with the exhibits and deposition testimony that were offered by submission.[2]

After hearing the arguments of counsel and the evidence presented at the hearing, and after reviewing the parties' briefs, the evidence presented by submission and the applicable law, the Court finds that Plaintiff's motion for class certification should be granted for the reasons stated herein.

---

[2]Plaintiff's expert is Dr. Jeffrey Leitzinger.  His first report is dated February 28, 2007 and his deposition was taken on March 2, 2007.  Defendants' expert is Dr. Kenneth Serwin.  His first report is dated March 20, 2007.  On June 18, 2007, Dr. Leitzinger supplemented his report, and Dr. Serwin submitted a rebuttal and supplemental rebuttal.  Dr. Leitzinger then submitted a response to the rebuttal on July 6, 2007.

Plaintiff submitted seven (7) bound volumes of exhibits, and Defendants submitted two (2) bound volumes of exhibits.  The parties also submitted two (2) volumes of deposition excerpts, with their respective designations and objections.

The evidence that the Court has relied upon in making its decision has been deemed relevant and the Court has given it the weight to which it was entitled. There is certain evidence that the Court found to be irrelevant to the class certification issues, including the Martinez deposition (relating to the exhaustion of administration remedies, a non-issue); communications with or opinions of the Comptroller (relating to liability, a merits issue); and ITSA propaganda. The Court relied upon the depositions taken in this case, and it was not necessary to resort to deposition testimony from the Atlanta case for purposes of determining the issues at hand.

Claims and defenses of the parties

A.      Plaintiff's allegations:

Plaintiff claims that Defendants have failed to remit hotel occupancy taxes owed to Plaintiff and other Texas cities, pursuant to Chapter 351 of the Texas Tax Code and similar municipal tax codes throughout the State. Section 351.002(a) of the Texas Tax Code (the "Enabling Act") specifically authorizes municipalities to impose hotel occupancy taxes, and section 302.102 of the Code states that "[a] home-rule municipality may collect taxes that are authorized by the charter of the municipality or by law." Tex. Tax Code Ann. §§ 302.102, 351.002(a) (Vernon 2008). Pursuant to such authority, all Texas cities identified as putative class members have enacted municipal ordinances pertaining to the collection and payment of hotel occupancy taxes in their jurisdiction. The Texas Tax Code and all of the municipal ordinances mandate that every person "owning, operating, managing or controlling" a hotel shall collect the tax imposed by law. See Texas Tax Code Ann. §156.053 (Vernon 2008); see also San Antonio Mun. Code, Art. IV, § 31-69.[3] If the person responsible for collecting and paying such

---

[3] The Court has conducted an independent review and analysis of all 175 municipal ordinances.

taxes fails to do so, the municipality may bring a collection lawsuit and/or a lawsuit to enjoin

hotel operations.  See Tex. Tax Code Ann. § 351.004(a) (Vernon Supp. 2008); see also San

Antonio Mun. Code Art. IV, § 31-74 (suit to enjoin hotel operations is "in addition to the remedy

of a collection suit").  Plaintiff also brings a common law claim for conversion, alleging that

Defendants must submit to the City any taxes that they have collected.

Since the inception of web-based hotel booking, the Defendants have conducted business

under two different models: the merchant model and the agency model.  Under the agency model,

the hotel determines the retail price paid by the consumer and the hotel remains the merchant of

record -- the Defendants simply act as agents and make the reservation for the consumer.  Under

the agency model, Defendants make a commission for their reservation services.  Under the

merchant model, Defendants enter into a contract with the hotel to obtain an inventory of rooms

at negotiated wholesale rates, determine the mark up, set the retail rate that the consumer will

pay, and sell the room to the consumer.  The Defendant *is* the merchant of record under the

merchant model.  Although Defendants have changed the characterization of their merchant

model in the past few years, the manner in which they conduct business has not changed – they

remain the merchant of record for all such transactions.

It is undisputed that Defendants have paid bed taxes to the hotels on the wholesale price

of the rooms, but they have never paid taxes on the retail price that the consumer pays when he

books a room through a web-based company.  As a result, Plaintiff alleges that a certain amount

of bed taxes are being lost on every hotel room in the City that is booked and paid for through the

web-based companies.  Plaintiff claims that Defendants should pay hotel occupancy taxes on the

difference between the retail price of the hotel rooms, which the occupants pay, and the

wholesale price that the web-based companies pay the hotels.  Although the amount on each

transaction is small, the cumulative effect may be large, especially for bigger cities with numerous hotels.  Moreover, the laws under which Plaintiff is suing have no limitations period.

B.      Defendants' allegations:

Defendants assert they do not "control" hotel operations; therefore, they are not required by law to collect or remit hotel occupancy taxes.  They also assert that only amounts charged by and paid "to hotels" are taxable.  Defendants also contend that the "mark-up" on the rooms (i.e. the difference between the wholesale and retail prices) includes their service fees, which are not taxable.  Defendants further claim that they cannot be taxed by cities with which they do not have a substantial nexus because it would violate their constitutional rights.  And finally, Defendants contend that class members have failed to exhaust administrative remedies.[4]

Legal standard for class certification

The class action procedure permits representative plaintiff(s) to litigate claims of members of the class even though the members are not named as parties.  Adjudication of a class action is binding on all members of the certified class.  Consequently, class actions are an exception to the general rule that an action is conducted by and binding on only individually named parties.  See Califano v. Yamasaki, 442 U.S. 682, 700, 99 S.Ct. 2545, 2557-2558 (1979).

The prerequisites for maintaining a class action are set forth in Fed.R.Civ.P. 23(a), which states:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so *numerous* that joinder of all members is impracticable, (2) there are questions of law or fact *common* to the class, (3) the claims or defenses of the representative parties are *typical* of the claims or defenses of the class, and (4) the representative parties will fairly and *adequately* protect the interests of the class.

---

[4]The class definition, by its terms, excludes cities with ordinances which require exhaustion of administrative remedies.

Fed.R.Civ.P. 23(a) (emphasis added).  In addition, Plaintiff must meet the requirements set forth

in Rule 23(b)(1),(2) or (3).  In this case, Plaintiff seeks certification under subsection (b)(3),

which states:

> (b) An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
>
> > (3) the court finds that the questions of law or fact common to the members of the class *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for the fair and efficient adjudication of the controversy.
> >
> > The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3)(emphasis added).  An action under subdivision (b)(3) "encompasses those

cases in which a class action would achieve economies of time, effort, and expense, and promote

uniformity of decisions as to persons similarly situated, without sacrificing procedural fairness or

bringing about other undesirable results."  State of Alabama v. Blue Bird Body Co., Inc., 573

F.2d 309, 315-16 (5th Cir.1978) (citing advisory committee note to rule 23).

　　　Plaintiff, as movant, has the burden of demonstrating the propriety of class certification.

Fleming v. Travenol Laboratories, Inc., 707 F.2d 829, 832 (5th Cir. 1983); Murillo v. Musegades,

809 F.Supp. 487, 501 (W.D. Tex. 1992).  "The class certification decision rests within the sound

discretion of the district court, so long as that discretion is exercised within the framework of rule

23."  Bell v. Ascendant Solutions, Inc., 422 F.3d 307, 311 (5th Cir. 2005).   In determining

whether an action is appropriate for class certification, the Court must refrain from conducting a

preliminary inquiry into the merits.  Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-178, 94

S.Ct. 2140 (1974). "At the same time, however, '[g]oing beyond the pleadings is necessary, as a

court must understand the claims, defenses, relevant facts and applicable substantive law in order

to make a meaningful determination of the certification issues.'" Unger v. Amedisys, Inc., 401

F.3d 316, 321 (5th Cir. 2005)(quoting Castano v. Am. Tobacco Co., 84 F.3d 734, 744 (5th Cir.

1996)). The parties herein conducted sufficient pre-certification discovery to assist the Court in

this task.

Class definition

Plaintiff seeks to certify a state-wide class of 175 Texas cities. (Dkt. # 74, Exh. A). The

cities must fit the following definition to be a member of the class:

> **Texas cities whose ordinances contain language that requires every person owning,**
>
> **operating, managing or *controlling* any hotel to collect and remit hotel occupancy**
>
> **taxes and whose ordinances do *not* contain administrative prerequisites to filing a**
>
> **lawsuit for the failure to collect or remit hotel occupancy taxes.[5]**

The Court has reviewed the ordinances of all 175 cities, and it does appear that they fit

this definition. Thus, the Court has a definite number of putative class members to consider for

numerosity purposes.

Formation of proposed subclasses

Plaintiff has proposed that four subclasses be formed, based on corporate ownership and

common legal representation of the various defendants: (1) the Expedia group; (2) the

---

[5]As noted in Rule 23(c)(1)(C), and as the Fifth Circuit stated in Richardson v. Byrd, 709 F.2d
1016, 1019 (5th Cir.), cert. denied, 464 U.S. 1009 (1983):

> The definition of a class is reviewable only for abuse of discretion. Under Rule 23 the district
> court is charged with the duty of monitoring its class decisions in light of the evidentiary
> development of the case. The district judge must define, re-define, subclass and decertify as
> appropriate in response to the progression of the case.

7

Travelocity group; (3) the Orbitz group; and  (4) the Priceline group.[6]  However, subclasses are

not typically formed based on common ownership or legal counsel and Plaintiff has not

explained why the Court should form multiple subclasses comprised of the same class members.

While Plaintiff may have proposed four subclasses to avoid concerns over subtle differences in

business practices between the Defendants, this evidentiary concern, which relates primarily to

the "control" issue, is common to the entire class.  Each and every city, whether litigating its

claim individually or as a class member, would have this same issue arise in the same context

and each city would need to rely on the same proof.  Thus, this fact issue does not give rise to a

conflict between class members and it does not appear that subclasses are necessary for that

purpose.

<u>Numerosity</u>

At this juncture, it is undisputed that Plaintiff has met the numerosity requirement.[7]

When this lawsuit began, Plaintiff had not clearly defined the class or identified the number of

putative class members.  (Dkt. # 1, p. 19).  However, Plaintiff clarified its proposed class

definition and identified 175 cities with the same or substantially similar tax ordinances, which

do not require the exhaustion of administrative remedies.  (Dkt. # 74, 88).  It would be

impracticable to join all cities individually.  The cities are geographically located in different

_____

[6]The Expedia group includes Expedia, Inc., Hotels.com and Hotwire.com, which are owned by
corporate parent, Expedia, Inc., a Delaware corporation.  (Dkt. # 74, p. 10).  The Travelocity group
includes Travelocity.com and Site59.com, which are owned by corporate parent Sabre Holdings
Corporation, a Delaware corporation.  The Orbitz group includes Orbitz.com, Cheaptickets.com and
Lodging.com, owned by corporate parent Cendant Corporation, a Delaware corporation.  The Priceline
group includes Priceline.com and Travelweb.com, owned by Priceline.com, Inc., a Delaware corporation.
(Dkt. # 74, pp. 2-5, 10, 15; Dkt. # 152, p. 3 n. 4).

[7]At the evidentiary hearing, defense counsel conceded: "Numerosity, 175 probably meets the
test."  (Tr. 73:21).

parts of the State, and while they all have the same claims and have allegedly suffered the same injury, it would not be economical for every city to bring their own individual claim.  A class action, if otherwise appropriate, would be the most efficient and judicious way of resolving the claims of all 175 cities.  The proposed class of 175 putative members is more than sufficient to meet the numerosity requirement under Rule 23(a)(1).  Mullen v. Treasure Chest Casino LLC, 186 F.3d 620, 624 (5th Cir. 1999)(a class of 100-150 members is within the range that generally satisfies the numerosity requirement); HERBERT B. NEWBERG AND ALBA CONTE, NEWBERG ON CLASS ACTIONS, § 3:5 at 247 (4th ed. 2002)("[A]s few as 40 class members should raise a presumption that joinder is impracticable and the plaintiff whose class is that large or larger should meet the test of Rule 23(a)(1) on that fact alone").

## Commonality

It is also undisputed that Plaintiff has met the commonality requirement, which is not demanding.[8]  As long as there is at least *one* issue that will affect all or a significant number of the putative class members, the requirement is met.  Mullen, 186 F.3d at 625; Johnson v. U.S., 208 F.R.D. 148, 167-68 (W.D. Tex. 2001); Bywaters v. U.S., 196 F.R.D. 458, 466-67 (E. D. Tex. 2000).  In this case, the primary issues common to the entire class include:  whether Defendants should be required to collect and remit hotel occupancy taxes, based on their "control" over hotels operations, if any; and, whether hotel occupancy taxes should be paid on the retail rate charged to hotel occupants or the wholesale or net rate charged by the hotels/suppliers.  These common issues will be determined by interpreting ordinances with the same or substantially similar provisions, and by considering the same evidence that all of the putative class members

---

[8]Again, at the evidentiary hearing, defense counsel aptly conceded: "Commonality, probably satisfied, one issue is enough."  (Tr. 73:24).

would use to prove individual claims.

As NEWBERG explains, "[w]hen the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected. NEWBERG, *supra*, § 3.10 at 277-78. Such is the case here. Plaintiff asserts that Defendants' policy and practice of paying hotel occupancy taxes based on the wholesale or net rate that they negotiate with the hotels, rather than the retail rates charged to the hotel occupants, violates all 175 municipal ordinances and results in ongoing monetary losses to all of the putative class members. The commonality requirement under Rule 23(a)(2) has clearly been met in this case.

<u>Typicality</u>

Under Rule 23(a)(3), the claims of the representative plaintiff must be typical of the claims of the class. "Like commonality, the test for typicality is not demanding." <u>Mullen</u>, 186 F.3d at 625; <u>Forbush v. J.C. Penney Co., Inc.</u>, 994 F.2d 1101, 1106 (5th Cir. 1993). The test "focuses on the similarity between the named plaintiff's legal and remedial theories and the theories of those whom they purport to represent." <u>Stirman v. Exxon Corp.</u>, 280 F.3d 554, 562 (5th Cir. 2002)(quoting <u>James v. City of Dallas</u>, 254 F.3d 551, 571(5th Cir. 2001)). Typicality "does not require a complete identity of claims." <u>Id.</u> Instead, the question is whether the class representative's claims have the "same essential characteristics of those of the putative class." <u>Id.</u> "Even relatively pronounced factual differences" between the individual claims will not defeat typicality as long as the claims are woven from the same legal fabric and arise from the same event, practice or course of conduct. <u>Baby Neal v. Casey</u>, 43 F.3d 48, 58 (3rd Cir. 1994); <u>see</u> <u>also</u> <u>Bywaters</u>, 196 F.R.D. at 467. If the representative plaintiff's claim is subject to a

unique defense that is reasonably likely to be a major focus of the litigation, the claim is atypical.

Carbajal v. Capital One, 219 F.R.D. 437, 440 (N.D. Ill. 2004).

Plaintiff asserts that typicality is easily met in this case. After reviewing the record and

the parties' arguments, the Court must agree. The individual claims of the City of San Antonio

have the same essential characteristics as the claims of the putative class members. While each

putative class member has its own ordinance, the claims arising thereunder, and the legal and

remedial theories on which the claims are based, are the same. The class representative and all

putative class members will contend that Defendants have a legal duty to collect and remit bed

taxes on the amount charged to the hotel occupant (the retail rate, sell rate or marked up rate),

rather than the lower amount that Defendants negotiate with the suppliers (the wholesale rate or

net rate). Their causes of action, which are identical, arise from the same uniform business

practice of selling rooms to hotel occupants as the merchant of record, but failing to pay taxes on

the amount paid by the occupant.[9] They all assert the same remedial theory as well – monetary

damages based on the amount of tax allegedly due on the mark up for each merchant model

transaction.[10]

Defendants attempt to defeat typicality by pointing to two differences in the language of

the San Antonio ordinance. Specifically, Defendants allege that "San Antonio alone purports to

tax amounts paid for services 'provided by the hotel which are not ordinarily subject to sales tax'

---

[9]See deposition testimony of corporate representatives, describing their nationwide merchant model business in remarkably similar fashion:  Varhol deposition at 32:13-34:3, 50:4-51:8; 81:22-82:12; Mantione deposition at 146:12-147:5, 154:9-20, 176:14-177:4; Henry deposition at 12:15-13:3, 14:12-24, 30:3-25, 55:3-15, 167:23-168:24, 180:23-181:21; Richards deposition at 36:13-38:11, 39:23-43:17, 112:12-23, 121:7-25, 139:13-141:18, 142:2-11, ); MacDonald deposition at 79:10-80:3, 90:14-91:25; Selsavage deposition at 94:23-96:2; Gordon deposition at 154:15-155:8, 155:16-22; Soder deposition at 82:2-19; Dunham deposition at 41:25-42:7, 56:3-8; Eckerling deposition at 93:24-96:8, 120:4-18, 177:4-12.

[10]See Leitzinger report, P Exh. D.

as well as '[c]harges not stated separately' on the bill or folio, whether or not they relate to cleaning or readying the room." (Dkt. # 200, p. 13).[11]  These differences do not appear to be relevant or material to the issues to be decided in this case; or, if they are relevant, they are minor and will not become a major focus of the litigation.[12]

   In the typicality analysis, the Court must be concerned with the nature of the claims, not the facts.  Nevertheless, if the facts reveal that there are personal services provided to the occupant by the hotel, those services will be  incurred at the time of the occupant's stay at the hotel – not at the time the occupant books the room on-line.[13]  Thus, personal services provided

---

[11]The San Antonio ordinance specifically states: "The tax shall be equal to nine (9) percent of the total price of a sleeping room or sleeping facility, said price to include all goods and services provided by the hotel which are not ordinarily subject to sales tax." San Antonio Mun. Code, Art. IV, § 31-68(b).

   The ordinance defines "consideration" as: "the price of, or value received for, the right to use a sleeping room, bed, or dormitory space or other sleeping facility in a hotel, and includes the price of conveniences customarily provided in connection with sleeping accommodations, including mattress, sheets, bedspreads, pillows, pillow cases, bed frames, air conditioning, electricity, lighting, water, soap, towels, wash cloths, toilet tissue, show or bath facilities, lavatory, chairs, trash receptacles, plus any other goods or services which are not ordinarily subject to sales tax.  The consideration paid for a sleeping room or facility shall not include the price of food served, nor the price of personal services rendered to the occupant which are unrelated to cleaning and readying a room for occupancy, nor any sales tax, nor occupancy tax assessed by the governmental agencies, provided that these charges are stated separately on the folio or invoice of the occupant.  Charges not stated separately shall be presumed to be part of the consideration paid for occupancy of a sleeping room or sleeping facility, and shall be taxed under this article." Id. at § 31.66.

   In its enabling legislation, the State of Texas used consistent language: "The price of a room in a hotel does not include the cost of food served by the hotel and the cost of personal services performed by the hotel for the person except for those services related to cleaning and readying the room for use or possession." Tex. Tax Code Ann. § 351.002(b) (Vernon 2008).

[12]As Defendants stated in one of their briefs, the ordinances employ a similar "anatomy." (Dkt. # 163, p. 2).  Douglas Andersen, a representative of Expedia, also acknowledged: "[w]e will generally look at the state ordinance, or statute, and get a sense from – from the state ordinance, because it's – it's common for the city to have an – to be enabled to impose its tax based upon the state ... ". (Andersen deposition at 120:22-121:2).

[13]Personal services provided by the hotel could include such things as food service, dry cleaning services, child care services or spa treatment services.

by the hotel would not affect the retail or sell rate that Defendants charge the occupant at the time of on-line booking, which is the rate that should be taxed under Plaintiff's theory.[14]  The second part of the argument relating to "charges not separately stated on the bill or folio," also appears to relate solely to charges that the occupant might incur while staying at the hotel, which would be

---

[14]Expedia's representative, Douglas Andersen, explained during his deposition:

Q: Which service fees is the tax recovery charge applied to, and which ones is it not?
A: Supplier imposed service fees that are taxable.
Q: Give me examples of those.
A: An example could be a safe fee that is imposed by the supplier and is taxable within that jurisdiction.
Q: Safe, as in locking your valuables in a safe?
A: Yes, or a – I've seen energy conservation fee that my be imposed by the hotel.
Q: Whereas, room service would not be something that the tax recovery charge would be applied to?
A: That would be an incidental that's charged at the time of, you know, separate – separately –
Q: So –
A: By the hotel.
Q: So how do you determine whether or not to impose a tax recovery charge on a fee such as a safe fee and not on a charge such as room service?
A: Well, in that case, we – room service would take place after our reservation, after we perform our booking services.

\* \* \*

Q: Who makes those determinations on whether a safe fee is taxable in one jurisdiction or not?
A: The hotel.
Q: Who makes the determination whether or not the room markup is taxable in one jurisdiction or not?
A: We – we make the decision that a facilitation fee, whether or not it is taxable.
Q: "We" being Expedia?
A: That's right.

(Andersen deposition at 101:20-102:17, 103:1-13).

Noreen Henry, a Travelocity representative, provided a similar explanation:

Q: Okay.  And to your understanding, there is no contract in a merchant model transaction between the hotel on the one hand and the consumer on the other, correct?
A: Correct.
Q: And the only charges that a hotel is permitted to charge one of your customers are for incidental charges, correct, room service and the like?
A: Yes, and any other fees that they may need to be charging them that are beyond what they collected from us.

(Henry deposition at 127:23-128:8).

paid upon check-out.  However, even if such language could be interpreted as applying to the

mark up that is charged by the OTC's at the time of booking, the Plaintiff's theory of "what is

taxed" does not change.  Plaintiff argues that the entire amount charged to the hotel occupant at

the time of on-line booking should be taxed, and that amount includes the mark up, regardless of

whether it is separately stated.

  In sum, Defendants' argument about the possible effect of the "different language" in the

San Antonio ordinance is a red herring.  Plaintiff did not bring this lawsuit to dispute the

itemized charges or fees in each hotel transaction.  Instead, Plaintiff is simply alleging that the

bed tax must be paid on the amount that the hotel occupant or customer is charged at the time of

on-line booking, regardless of how Defendants arrive at that number or characterize their mark

up, fees or charges.  Moreover, there is nothing in the record to suggest that Defendants, who

have been calculating taxes and fees for years, are confused about specific charges to the hotel

occupant and whether a tax is assessed thereon.[15]  As evidenced by their deposition testimony,

Defendants have a crystal clear understanding of the net or wholesale rate as opposed to the sell

or retail rate, what is included in those rates, and whether hotel occupancy tax is paid on those

amounts.[16]

  The fact that the San Antonio ordinance is not congruent to the other municipal

ordinances does not defeat typicality.  See Forbush, 994 F.2d at 1106 (while much of the putative

_____

  [15]See Tr. 169:11-170:1; Varhol deposition at 90:5-18; Mantione deposition at 176:14-177:9; Henry deposition at 40:20-42:6, 48:4-16, 59:13-21, 60:13-61:13; Selsavage deposition at 66:16-22; Andersen deposition at 101:20-103:13.

  [16]See, e.g., Varhol deposition at 43:14-22, 49:5-50:1, 50:4-51:8, 54:1-7; Henry deposition at 65:3-17; 67:3-69:9, 74:4-75:4; Swarthout deposition at 108:12-23; Mickle deposition at 132:11-133:8; Selsavage deposition, 48:1-17, ; MacDonald deposition, 191:14-192:10; Andersen deposition, 108:10-109:15, 272:15-273:3.

class was covered by other plans, the class representative "framed her challenge in terms of Penney's general practice of overestimating social security benefits"). The City of San Antonio and the putative class members possess the same legal interests and have allegedly suffered the same injury. See General Tel. Co. v. Falcon, 457 U.S. 147, 102 S.Ct. 2364, 2370 (1982). The typicality requirement is satisfied.

Adequacy of representation

The last requirement for certification under Rule 23(a) focuses on the class representative and its counsel, and whether they can "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). To satisfy this requirement, the interests of the class representative must not conflict with the interests of the putative class, and class counsel must be able to competently represent the class. Piggly Wiggly v. Interstate Brands Corp., 215 F.R.D. 523, 530 (E.D. Tex. 2003); Bywaters, 196 F.R.D. at 467-68. Differences between the class representative and the putative class members renders the class representative inadequate only if those difference(s) create conflicts of interest. Mullen, 186 F.3d at 626. An example of such a conflict might be a class representative whose claim is subject to a different statute of limitations. See Corley v. Entergy Corp., 220 F.R.D. 478, 483-84 (E.D. Tex. 2004).

Defendants have not claimed that a conflict of interest exists between the City of San Antonio and the putative class, and the evidence does not reflect any differences between them that would be significant enough to create a conflict. There are no legal issues that would compromise the City's ability to represent the class, and their legal interests appear to be perfectly aligned. The City has a tremendous stake in this litigation, and it has been actively participating in the prosecution of the case. There is no reason to believe that the City's interest and participation in the litigation will change.

With regard to adequacy of counsel, the Court must determine whether class counsel has the qualifications, experience and training to litigate the case to its conclusion. Although the parties addressed this issue in their preliminary briefing, it has not been seriously disputed, if at all. The lead attorneys in this case are Steven Wolens and Gary Cruciani. Both attorneys have a wealth of experience in complex litigation, including substantial class action experience. (Dkt. # 45, Exh. B; Dkt. # 190). Their law firm, Diamond McCarthy, is able to provide the necessary staff support and financial resources for the prosecution of the lawsuit. The law firm of Baron & Budd will continue its role as co-counsel, and is available to provide extra support, if needed. Attorney Frank Herrara, Jr. is also appearing as local counsel, and Mr. Herrera's professional reputation and legal knowledge are undeniable. Having considered their qualifications and experience, and having observed the manner in which they have handled the case thus far, the Court is confident that class counsel will serve the best interests of the putative class in litigating this case to conclusion.

### Predominance and Superiority

Having found that Plaintiff has met all four requirements under Rule 23(a), the Court must turn to the additional requirements under Rule 23(b)(3): that questions common to the class predominate over questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed.R.Civ.P. 23(b)(3). The rule states that "matters pertinent to the findings include: (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and, (D) the difficulties likely to be encountered in the

management of a class action." Id.

In determining predominance, the question is not whether common issues exist, but whether those common issues predominate over individual ones. O'Sullivan v. Countrywide Home Loans, Inc., 319 F.3d 732, 742 (5th Cir. 2003).  This involves more than just counting the common and individual issues; it requires an examination of the relative significance or weight of the issues, and whether the issues are likely to become a major focus of the litigation. See Mullen, 186 F.3d at 626 (the common issues were "not only significant but also pivotal").

In its analysis, the Court must consider whether the putative class members would be able to rely on common or "generalized" proof, as opposed to individual proof, in prosecuting their claims. Blue Bird, 573 F.2d at 322, 324.  In other words, the Court should ask whether the "addition or subtraction of plaintiffs to or from the class will have a substantial effect on the substance or quantity of evidence offered." Id.  If the claims of the cities would require generalized or common proof, then a class action would certainly be the most efficient method of litigating the claims.  If the claims would require individual proof, the class could degenerate "into a series of individual trials" and become unmanageable. Countrywide, 319 F.3d at 738.

A.    The "control" issue:

The parties disagree on whether the issues in the case are common or individual to each class member, and the impact of those issues on class certification.  Both sides do recognize, however, that the core liability issue is whether Defendants have a responsibility, under the tax ordinances, to collect and pay hotel occupancy tax on the amount paid by the occupant.  In proving a statutory duty to collect and pay bed taxes, the overriding fact issue will be whether Defendants exercise "control" over hotel operations, as that term is used in the ordinances.  This fact issue is indisputably common to the entire class, because all 175 ordinances use the

17

"control" language in their ordinances and each city would need to prove "control" to prevail on their claim.

The question then becomes whether the common issue of "control" is subject to common proof. To show Defendants' "control" over hotel operations, Plaintiff relies on the "merchant model" method of doing business. Again, this model is a uniform business practice used nationwide for years in which the OTC's are "merchants of record" in transactions with hotel occupants. In the course of transacting business under the merchant model, Plaintiff claims there are many reasons why Defendants exert control over hotel operations, which include but are not limited to: negotiating contracts with hotels; marking up the wholesale price of the hotel rooms; determining the retail price that will be offered to hotel occupants; determining a "service fee" and including that fee in the margin; determining a cancellation policy and the amount of any penalty for cancellation; calculating the occupancy taxes and determining whether it will be assessed on the net or sell rate; entering into a contract between the OTC as the merchant and the occupant as the consumer; determining the total price of the room (sell rate) and collecting the occupancy tax assessed in each transaction. In response, Defendants assert that they don't engage in a common course of conduct. Specifically, they claim that their business practices are materially different and have changed over time, and their contracts with the various hotels are different and have changed over time. Thus, they contend that Plaintiff cannot prove the common issue of "control" by using common proof.

After reviewing the record, it is clear that Defendants not only engage in a common course of conduct, but that many of their business practices are virtually identical.[17] The

---

[17]These practices include but are not limited to the manner in which they contract with the hotels, the manner in which they determine and assess cancellation policies and fees, the manner in which they determine the mark up and fees to arrive at an acceptable margin and retail/sell rate; and, the manner in

deposition testimony of the corporate representatives, standing alone, reflects an amazing

similarity in practice, procedure and corporate methodology among all of the OTC's.[18]

Moreover, the business practices that are relevant to the issues in this lawsuit have remained

essentially unchanged over the years, even though their description of same may have changed.[19]

Defendants assert that one issue that is not common among them is the manner in which

hotel agreements impact their operations.  Defendants claim that the agreements themselves are

different, and that the agreements have changed over time.  Thus, any "control" being exercised

by Defendants will vary, depending on the agreement.[20]  After reviewing the evidence, the Court

---

which they calculate, assess and pay hotel occupancy taxes.

[18]In fact, Plaintiff's counsel was obviously curious, at one juncture, to determine exactly how the companies remain competitive, considering that they operate in the same fashion and even charge the same price:

> Q: So – so given that, how do you compete with Expedia and Travelocity and the like if everybody is contractually bound to charge the same price for that hotel room?

> A: Right.  I don't have knowledge of the other contracts; but, you know, relative to competing, our sites market and make available and distribute the opportunity for consumers to reserve hotel rooms and, you know, *its really in our marketing and distribution strategies in terms of how we compete.*

(Bianco deposition at 80:15-20)(emphasis added).

[19]See Varhol deposition at 105:9-106:1, 121:17-122:4; Henry deposition at 41:19-42:6, 55:3-15, 60:13-25, 67:3-69:9, 85:7-23, 119:1-120:6; Mantione deposition at 146:12-147:10, 150:23-151:9; Gordon deposition at 154:15-156:3; Soder deposition at 64:7-65:12, 222:23-224:10, 224:21-225:5; Dunham deposition at 94:11-15; Eckerling deposition at 128:7-20, 177:4-12; Richards deposition at 112:5-23, 152:5-153:17; MacDonald deposition at 133:9-25, 224:6-225:9; Andersen deposition at 108:10-109:15.

[20]For example, Defendants argue that some agreements specifically require that the hotels determine the net rate.  (See D Exh. 1, 2, 14).  The corporate representatives explained that the hotel either determines the net rate or the rate is negotiated.  (See, e.g., Varhol deposition at 109:16-21; Soder deposition at 122:14-123:6).  However, this is only one aspect of the "control" issue, and while the Defendants may not have unilateral control over the net rate, it appears that they do exercise control over the room rate offered to the consumer/occupant, as long as they do not offer the room for less than the rate being offered by the hotel.  (See Henry deposition at 117:13-118:19, 154:1-5; Mantione deposition at 131:9-132:2; 182:24-183:6, 207:19-209:14; Bianco deposition at 78:8-79:2; Eckerling deposition at 46:12-47:15, 51:4-20; Andersen deposition at 204:10-205:6).  Hotwire appears to be the sole exception, because it can provide a rate that is less than what the hotel offers.  (See MacDonald deposition at 25:12-

finds that while every hotel contract may not contain the same terms, the material aspects of the agreements and the practical implications thereof are the same or substantially similar.[21]  Many of the hotel agreements are standard form agreements with boilerplate language, and while the OTC's may need to negotiate a contract with the major chains, there are only about 15-20 major hotel chains.[22]  With the exception of Hotwire, the affiliated OTC's or those with common ownership (e.g. the Priceline group, Orbitz group or Expedia group) negotiate the same agreements with the hotels.[23]   The Travelocity group has only entered into one new contract with a major national chain since 2004, and the other contracts have simply been renewed.[24]  With many of the contracts, they have simply added indemnification language to protect the hotels from liability for bed taxes on the OTC's margin and/or they have changed language referring to

---

24).  However, the question at this stage of the proceedings is not whether Defendants actually exercise control.  The question is whether their practices, which are the focus of the control issue, are the same or substantially similar.

   [21]With regard to cancellation policies, for example, the representatives explained that the hotel occupant must comply with the OTC's cancellation policy, which may incorporate the hotel's policies. Invariably, with every OTC except Hotwire (which has a non-cancellation policy), the cancellation fee is $25.00. (See Henry deposition at 128:12-132:7; Soder deposition at 306:19-307:16; 308:15-309:4; Dunham deposition at 61:5-20; Eckerling deposition at 234:4-235:3; Richard deposition at 89:20-90:16; Andersen deposition at 78:11-22).  The same consistency is seen with room rates.  Almost without exception, the net rate and sell rate for a given room on a given day are the same among the OTC's because the Defendants' agreements with the hotels all contain "parity" or "Most Favored Nation" clauses.  This also makes the OTC margins the same.  (See e.g., Henry deposition at 173:9-22; Mantione deposition at 42:19-45:16; 51:3-16, 64:13-66:1, 67:4-70:9, 207:19-209:14; Gordon deposition at 206:5-207:13; Soder deposition at 111:16-112:15, 113:6-13; Bianco deposition at 35:4-36:14, 69:15-70:11, 78:8-79:2, 79:14-80:7; Eckerling deposition at 51:24-52:13).

   [22]See Mantione deposition at 23:1-11, 51:3-16 (there are 15 major chains); Assante deposition at 29:7-10 (they have contracts with 19 of the top 20); Soder deposition at 158:16-159:6, 210:14-18 (the contracts have boilerplate language); Bianco deposition at 26:23-28:18 (majority are standard form contracts); MacDonald deposition at 206:1-16, 206:25-207:4 (a standard online agreement is available).

   [23]See Gordon deposition at 106:16-107:6; Bianco deposition at 62:25-63:5; Richards deposition at 20:8-13, 140:2-16; Assante deposition at 15:7-24.

   [24]Mantione deposition at 87:12-88:11.

the "sale of rooms."[25]

While the fact finder will ultimately determine whether the Defendants' practices constitute "control" under the tax ordinances in question, the evidence on this issue can be derived from common sources of proof and the type of evidence presented at trial will not differ between class members. As Defendants' corporate representatives have confirmed, the *amount* of tax may differ between the cities, but the manner in which the Defendants otherwise conduct business (including the manner in which they calculate, assess and collect tax) does not change from city to city, nor has it changed in any material way over time.[26]

---

[25]See Mantione deposition at 144:15-20; 178:19-179:4, 179:21-180:6, 193:5-22, 197:3-10, 198:24-199:22; Bianco deposition at 94:13-95:9, 109:1-11, 109:24-110:6; Andersen deposition at 313:2-11).

[26]As Jeffrey Eckerling of Orbitz testified:

Q: Okay. And in that [merchant model] procedure is a national; – is a nationwide procedure that is used by Orbitz, is it not?
A: Yes, it's used across hotels, across – across the country.
Q: The – the beginning point – and I understand that you have different agreements with different hotels, but the beginning point of the merchant business model is for Orbitz to negotiate a discounted room rate with various hotels, correct?
A: Yes.
Q: That's a national business practice to do that, correct?
A: Generally speaking, we use that practice across many cities. We have agreements with chains that are across many cities.
Q: Yes, sir. And then there is a markup and fee booking engine, correct?
A: Yes.
Q: And that's a nationwide booking engine, correct?
A: Yes.
Q: In other words, if you wanted to calculate a markup in a fee for San Antonio, it would go into that same engine as Dallas or Los Angeles or Pocatello, right?
A: Yes, the same engine would be used, but potentially different inputs into the system.
Q: Sure. The inputs, the variables may change given on the hotel or the city or the tax rates, but he engine itself, you have one engine that is used to process all markups and fees nationwide, correct?
A: Yes.

(Eckerling deposition at 94:13-95:20). Joseph Selsavage of Hotwire also testified:

Q: Hotwire's opaque business model is a nationwide model, correct?
A: Yes.
Q: Operates the same in Texas as it does anywhere else, correct?

B.     The issue of what is taxed:

Another liability issue under the statutory claims is "what is taxed." Plaintiff contends that this issue is common to the entire class because each putative class member must prove that the retail or sell price of the room is subject to bed tax, and not simply the wholesale or net rate that the hotel charges the OTC's. Again, if each city does not prove that the retail amount charged to the hotel occupant is "what is taxed" under their ordinances, they will not prevail on their statutory claims. Thus, this issue is clearly common to the entire class.

Defendants contend, however, that this issue cannot be litigated on a class-wide basis because the ordinances contain different language on "what is taxed." In other words, even though Plaintiff's theory is the same (i.e., that the retail or sell price of the room is subject to bed tax), Defendants claim that applying that theory under the various ordinances will be unmanageable because the statutory language is different.

---

A: Yes.
Q: And the way in which tax recovery charges are calculated by Hotwire operates the same for every city in the State of Texas, does it not?
A: Yes.
Q: And the way in which the variable service fee operates [is] the same for every city in Texas, correct?
A: Yes.
Q: And the – the fixed service fee operates the same for every city in Texas, correct?
A: Yes.
Q: And the computer processes operate the same for San Antonio as they do for every city in Texas, correct?
A: Yes.
Q: And the accounting that Hotwire does operates the same for San Antonio as any other city in Texas, correct?
A: Yes.
Q: Because what we're dealing with are national business models, national business practices, correct?
A: Yes.

(Deposition of Selsavage at 94:23-96:3).

After reviewing the ordinances, it clearly appears that the operative language on "what is taxed" is the same for the City of San Antonio and at least forty-six (46) other municipalities. Those include the cities of Alvin, Austin, Azle, Baytown, Bedford, Boerne, Borger, Bridge City, Burkburnett, Cleveland, Commerce, Conroe, Corpus Christi, Corsicana, Decatur, Denton, Eagle Pass, El Paso, Fairview, Gainesville, Granbury, Grapevine, Harker Heights, Hillsboro, Junction, Kaufman, La Marque, Lacy-Lakeview, Lancaster, Lewisville, Lockhart, McAllen, McKinney, Midland, Muleshoe, Odessa, Rockport, Round Rock, Rowlett, San Marcos, Sante Fe, Shenandoah, Sonora, Sugar Land, Terrell and Webster.[27]  While the language in the ordinances of these municipalities is not identical in every respect, they are strikingly similar and the differences, if any, appear to be mere semantics.[28]  The Court does not anticipate that the interpretation of these ordinances will be inconsistent or require individual consideration, given the substantial uniformity of the ordinances.

The other 128 municipal ordinances are likewise similar, and include Abilene, Addison, Alice, Amarillo, Angleton, Aransas Pass, Argyle, Balch Springs, Beaumont, Bellville, Benbrook, Big Spring, Brenham, Bridgeport, Bryan, Burleson, Canyon, Carrollton, Castroville, Cedar Hill, Cedar Park, Cleburne, Coleman, College Station, Colleyville, Columbus, Coppell, Copperas Cove, Dallas, Deer Park, DeSoto, Dickinson, Duncanville, Edinburg, Euless, Farmer's Branch, Flatonia, Flower Mound, Forrest Hill, Forney, Fort Stockton, Fort Worth, Fredericksburg, Friona, Frisco, Garland, Georgetown, Gonzales, Grand Prairie, Greenville, Groves, Haltom City, Haslet, Hedwig Village, Henrietta, Hidalgo, Houston, Humble, Hurst, Ingleside, Irving, Jersey Village, Kerrville, Kilgore, Killeen, La Feria, La Porte, Lake Dallas, Lake Jackson, Laredo, League City,

---

[27]See ordinances in Volumes 3 and 4 of Defendant's exhibits.

[28]For example, the "cost of occupancy of any room in a hotel" versus the "cost of a sleeping room in a hotel."

Longview, Lorena, Lubbock, Mansfield, Marble Falls, Marshall, Mesquite, Mexia, Mission, Mt. Pleasant, Nacogdoches, Nassau Bay, New Braunfels, N. Richland Hills, Palestine, Pasadena, Pearland, Pharr, Port Aransas, Port Arthur, Red Oak, Richardson, River Oaks, Rockwall, Rosenberg, Saginaw, San Angelo, Sanger, Schertz, Seabrook, Sealy, Seguin, Selma, Sherman, South Houston, Stafford, Stephenville, Temple, Texarkana, Texas City, Tomball, Tyler, Universal City, Victoria, Vidor, Waco, Watauga, Weatherford, Weimar, Westlake, Wharton, White Settlement, Whitney, Wichita Falls, Winnsboro, Wolfforth and Wylie.[29]  Like the first 47 ordinances, the language in these ordinances contain the same or very similar terms and definitions which impose a bed tax on the cost of occupancy of any room furnished by a hotel.[30] However, there is one difference in the statutory language of these 128 municipalities that could possibly set them apart from the first 47 municipalities.  Specifically, these 128 city ordinances contain additional language in the tax <u>rate</u> provision that refers to the consideration paid by the occupant "to the hotel" (e.g. Dallas) whereas the tax rate provisions in the first 47 ordinances simply refer to the amount that the occupant pays "for a sleeping room" (e.g. San Antonio).[31]

While this difference in the tax ordinances is not enough to override the many common issues, the Court has considered whether it would be enough to create a subclass to address the issue.  After due consideration, however, the Court anticipates that this issue will create, at most, an additional legal argument at the summary judgment stage.  It does not appear that discovery

_____

[29]<u>See</u> ordinances in Volumes 3 and 4 of Defendant's exhibits.

[30]<u>See</u> specifically, the definitions of "consideration," "occupancy" and "occupant" which are the same or similar among all 175 ordinances.

[31]The Texas Tax Code does not contain the "to the hotel" language.  <u>See</u> Tex. Tax Code Ann. §156.052 (Vernon 2008).  Plaintiff asserts that this language is mere surplusage and that Defendants are not construing these terms in context.  Plaintiff argues that a different interpretation of the ordinances based on this language would lead to an absurd result of zero tax on any on-line transaction because the occupant never pays the hotel for the room. (Tr. 124).  Obviously, this is a merits issue that will be decided at a later time.

will be affected, nor does it appear that the trial will be adversely affected by this issue.

Although sub-classing may "sometimes represent a workable solution to differences in

substantive law," the Court is not convinced that subdividing the global class into two subclasses

solely for the purpose of addressing one legal issue will provide more efficiency, given the

various other legal and factual issues to be determined class wide. MANUAL FOR COMPLEX

LITIGATION, FOURTH, § 21.24 (2004).

C.     The issue of damages:

Another pivotal issue in determining whether class certification is appropriate is whether

the proof on damages will be individual or formulaic. After reviewing all of the evidence,

including the experts' testimony and reports, as well as the testimony of the OTC corporate

representatives, it is clear that alleged damages are subject to common proof and can be

calculated on a formulaic basis. There should be very few individual issues that arise with regard

to damages or the calculation thereof, and those issues, if any, should be minor at best.

Plaintiff has proposed a simple mathematical formula for calculating damages in this

case: A (room mark up) + B (service fees) x C (tax rate) = D (tax underpayment). (Dkt. # 218, p.

6). As the corporate representatives have testified, supplying the numbers for this formula is a

relatively simple task. First, each Defendant has retained all hotel transaction data for each city

in the State of Texas.[32] Most Defendants have retained all hotel transaction data since the

inception of business. Hotels.com has retained such data since at least 1994 (3 years after its

inception).[33] That transaction data contains the numbers that would be used in the formula for

---

[32]See Swarthout deposition at 7:14-8:1, 38:23-40:13, 66:9-15; Mickle deposition at 154:15-20;
Selsavage deposition at 109:1-4; Andersen deposition at 25:25-26:10, 40:25-41:9, 149:13-18; Varhol
deposition at 59:16-60:14; Henry deposition at 97:14-18; Hanson deposition at 70:4-17; Gordon
deposition at 102:22-103:8; Soder deposition at 296:15-19; Dunham deposition at 50:22-51:16; Dr.
Leitzinger testimony, Tr. 198:10-17, 211:1-5.

[33]Mickle deposition at 8:10-13, 25:23-26:1; 143:7-13; 160:16-161:3.

damages which, as the corporate representatives readily admit, would be easily calculable.[34]  In

fact, it appears that most of this data has already been gathered, and Plaintiff's expert, Dr.

Leitzinger, has already created some damage summaries with relative ease.[35]

     Dr. Leitzinger has hired for the purpose of determining whether damages may be

calculated on a formulaic basis.  (Dkt. # 217, Exh. D).  He is a highly qualified expert in his field,

and has prior experience in the calculation of formulaic damages in class actions.  (Tr. 192-93).

His opinions have a solid foundation and his reasoning appears to be sound.  On the other hand,

Defendants' expert, Dr. Serwin, has not testified as an expert in a class action and has never

testified on issues relating to formulaic damages.  (Tr. 280:9-12; 315:16-19).  Dr. Leitzinger

explained that once he has the transaction data (which is available), and a computer program to

calculate the data (which is *not* complex), "the mathematics in it are actually very simple."  (Tr.

203:10-12).[36]  While Dr. Serwin has attempted to create "individualized complexities" in the

calculation of damages by nitpicking the transaction data, Dr. Leitzinger explained that the issues

being raised are not complexities at all.[37]  However, to the extent any of the Serwin complexities

---

[34]See Swarthout deposition at 65:3-21, 66:16-23; Mickle deposition at 161:8-162:7, 166:12-
167:2, 167:8-14, 167:22-168:4; Selsavage deposition at 142:4-15; 15):15-151:2; Andersen deposition at
147:11-148:23; 151:15-154:4 (once taxability is determined, the formula for damages is "not rocket
science"); Varhol deposition at 79:20-80:8; Hanson deposition at 79:18-80:12; Gordon deposition at
138:1-139:1.

[35]See Exh. ALL 49; Exh. 3 to Leitzinger report.

[36]See also Leitzinger testimony at Tr. 204:21-25; 205:1-15; 205:16-22.

[37]For example, Dr. Serwin opined that damages simply couldn't be calculated on package
bookings.  (Tr. 327:8-328:7).  However, Dr. Leitzinger explained how damages for package or bundled
bookings (which comprise 5% of total bookings), as opposed to stand alone hotel bookings (which
comprise 95% of total bookings) could in fact be calculated, even though it took a few more steps to
apply the formula.  (Tr. 218:8-219:24; 220:12-23).  Dr. Serwin admitted that this "complexity" was
present in only .002 to .004 of the total number of transactions.  (Tr. 320:23-321:16).

     Dr. Serwin also believed there was a "complexity" in applying the "reservation change" data
from Expedia, which involves .001 of the total transactions.  (Tr. 319:1-23; 321:17-322:13).  Both
experts agreed that this data was identifiable, and Dr. Leitzinger determined there was, in fact, a way to

could affect the calculation of damages, they are identifiable, could be accounted for, and would affect *less than one percent* of all the transactions in question.  (P Exh. E, F (Leitzinger reports)). Even Dr. Serwin admitted that 99.2% of all transaction data squarely fit the damage formula proposed by Dr. Leitzinger.  (Tr. 319:1-23; 319:24; 324:18-23).

In summing up whether the calculation of damages becomes "complex" if the lawsuit is a class action as opposed to an individual action, Dr. Leitzinger testified that it "doesn't change the complexity of the calculation, it just changes the number of numbers that you have to put through the calculation . . . [a]nd that's what computers are for."  (Tr. 205:6-15).  Thus, this case appears to be well-suited for class certification from a damages standpoint.  To the extent that the minutiae of problems perceived by Defendants' expert do arise, they would arise, if at all, from the transaction data that every single city would rely upon in an individual suit.  Thus, the issues do not change or become more complex as a result of class certification.  (Tr. 200:16-201:13; 219:25-220:11; 231:10-19; 270:23-271:15; 316:14-317:5).

---

calculate the taxes due on those transactions without tremendous difficulty.  (P Exh. E, p. 5; Tr. 322:10-17).

Dr. Serwin also stated that Hotwire affiliate transactions would create a "complexity," even though those transactions comprise 1/10 of one percent of all transaction data.  (Tr. 322:23-323:17). Again, Dr. Leitzinger stated that such data is identifiable and can be rather easily worked into the formula.  (P Exh. E, p. 8).

Dr. Serwin also doubted the accuracy of the tax rate for each hotel transaction.  However, Dr. Leitzinger explained that the Texas Comptroller maintains all such data, which is available either on-line or upon request.  (P Exh. E, p. 10).  Moreover, Defendants' representatives testified that their records are based on the tax rate provided to them by the hotels.  (MacDonald deposition at 237:10-13; Soder deposition at 84:12-85:5; Dunham deposition at 68:18-69:23).  Certainly the hotels should know which city they are situated in, and Plaintiff should be able to rely on that information just as Defendants have relied on it for years in transacting business.

Finally, Dr. Serwin questioned whether tax exempt transactions would create a "complexity" but there is no evidence to suggest that tax exempt transactions are even handled by the on-line companies. (Tr. 348:4-8).

Assuming the class proves that it is entitled to damages, Defendants argue that some, but not all, of the putative class members may be entitled to statutory interest or penalties for underpayment or late payment of taxes. If so, the cities entitled to statutory interest or penalties can be readily identified and the amount of such interest or penalties can be calculated and presented to the Court post-verdict. This should not be an issue for the jury; instead, it should be a relatively minor issue for the Court to decide prior to judgment.

D.    Negative value lawsuits:

Another consideration in determining whether a class action would be superior to individual lawsuits is whether individual lawsuits would have a negative value. Norwood v. Raytheon Co., 237 F.R.D. 581, 604 (W.D. Tex. 2006)("the most compelling rationale for finding superiority in a class action [is] the existence of a negative value suit")(quoting Castano v. Am. Tobacco Co., 84 F.2d 734, 748 (5th Cir. 1996)). Common sense dictates that many of the cities would have a negative value lawsuit if they pursued this matter on an individual basis. As the result, there does not appear to be an interest in individually controlling the prosecution or defense of separate actions. Many of the putative class members are small municipalities without an abundance of hotel business. Moreover, most of the Defendants have been in the on-line hotel business, or using the merchant model, for a limited amount of time.[38] As a result, the number of on-line transactions is simply going to be smaller for some municipalities. Considering the smaller number of transactions and the small amount of damages per transaction, and considering the costs associated with this type of litigation, the negative value of some individual lawsuits would appear to be obvious.

---

[38]See, e.g., Hanson deposition at 22:2-11 (Travelocity has used MM since November 2002); Soder deposition at 171:13- 24 (Priceline entered the MM business in May 2004); Dunham deposition at 54: 9-13 (Orbitz began MM program in 2003).

Plaintiff's expert, Dr. Leitzinger, did perform a sample calculation to confirm that the damage claims of most putative class members would be small, which would result in a "negative value" lawsuit if the claims were prosecuted individually.  (See Exh. ALL 49; Tr. 227).[39]  Dr. Leitzinger also confirmed that the small numbers are not "really the [tax] rate so much as it [is] the total volume of activity." (Tr. 228).  Because the City of San Antonio has a large volume of booking due to its tourism business, its claim for damages is obviously going to be larger.  However, many municipalities simply could not justify the expenses of individual litigation, considering the value of their claim.

E.      "Nexus" issue:

Defendants contend they cannot be "taxed" on activities in cities with which they have no substantial nexus.  Again, this argument is a red herring because the occupant of the room (who is the taxpayer) is already being taxed, and the Defendants have already been collecting and remitting taxes on the rooms they sell.  The only question in this lawsuit is whether the Defendants have an obligation to collect and remit occupancy tax on the higher sell rate, rather than on the lower net rate.  If Defendants believed that they had no obligation whatsoever to collect and remit occupancy taxes, they would not have been doing so.  None of the cases cited by Defendants appear to be applicable on this point.

F.      Municipalities may be members of a class:

Defendants further argue that certifying a class of municipalities is inappropriate because it would violate the "non-delegation doctrine."  The legal authority is to the contrary.  There have been numerous  Texas cases in which the courts have certified classes of municipalities, and the "non-delegation doctrine" argument has been expressly rejected when raised.  See City of San

---

[39]Dr. Leitzinger indicated that only five of 175 putative class members would have claims above $50,000.00 for the year 2005.

Benito v. Rio Grande Valley Gas Co., 109 S.W.3d 750, 757-58 (Tex. 2003); see also Central

Power & Light Co. v. City of San Juan, 962 S.W.2d 602, 612-13 (Tex. App.–Corpus Christi

1998, pet. dism'd w.o.j.).

G.    Other considerations:

  The Court has considered the extent and nature of any litigation concerning the

controversy already commenced by or against members of the class.  To the Court's knowledge,

there is no litigation pending which involves any of the putative class members.  There was a

lawsuit filed in the City of Houston, but the claim was dismissed without prejudice in rather

hasty fashion and there was no ruling on the merits.

  The Court has also considered the desirability or undesirability of concentrating the

litigation of the claims in this particular forum.  Because the putative class members are spread

throughout the State of Texas and Defendants conduct business in diverse places, there is

probably no ideal forum for this litigation.  However, the Western District of Texas is just as

desirable, if not more desirable, as any other forum.  The Court's docket is busy, but the dockets

in other districts are also busy.  There should not be any need for regular court appearances, but

the City does have an international airport and a wide selection of hotel accommodations.

Defendants have not disputed that this particular forum is appropriate, and the Court cannot find

any reason for determining otherwise.

  Finally, the Court has considered the difficulties likely to be encountered in the

management of a class action and how the case may be tried.  While individual issues may arise,

those issues should be minor deviations, rather than a major focus of the litigation.  The parties

conducted extensive discovery on the class certification issues, which overlapped to some extent

with merits discovery.  In reviewing the evidence, a clear, concise road map for trial on the

merits has emerged and the Court does not anticipate that the litigation will change dramatically

or become unmanageable as a class action.

Much of the preliminary groundwork has been laid, and the fundamental liability and damage issues (which are common to the class) will not change regardless of whether this is a class action or the City of San Antonio's action. While the Court has noted one issue that is not applicable to the entire class, *supra* at 24, that issue will not become a major focus of the litigation. The other liability issues are common to the entire class, and the pivotal fact issue of "control" can be presented to the fact finder in the same way it would be presented by the City of San Antonio in an individual trial. Because the "control" issue is based on Defendants' conduct, the evidence will focus on Defendants' policies and practices. This evidence will not change, regardless of the size of the class. Likewise, the manner in which damages would be calculated and presented to the jury if the City of San Antonio was trying this case individually would not differ from the manner in which damages will be calculated and presented to the jury for 175 class members. Only the "number of numbers" will change, and the Court is confident that the evidence can be presented to the jury in a manner that will not be confusing.

In sum, forcing the municipalities to litigate these issues individually would be a waste of judicial resources and a waste of the parties' resources. It could also lead to inconsistent results, despite the consistency in the municipal tax ordinances and the consistency in Defendants' business practices. A clear, consistent result, whether it favors one side or the other, would clearly benefit all parties to the litigation, especially considering the length of time that this issue has been debated at both the local and national level.[40]

---

[40]See Selsavage deposition at 55:10-22 (there have been discussions about taxing the reservation or sell rate since 2001); see also Plaintiff's advisory detailing Defendants' legislative and congressional lobbying efforts (Dkt. # 245); see also P Exh. 97, Expedia 10-K, disclosing that it had established a reserve for potential tax liability.

For these reasons, the Court finds that Plaintiff's Motion for Class Certification should be GRANTED, and this case should proceed as a class action.  This opinion is temporarily sealed, but will be unsealed on June 12, 2008 unless the parties show good cause as to why is should remain sealed.  In the meantime, if the parties wish to utilize a redacted version of this opinion for any reason, they shall allow the other side to review their redactions prior to releasing it to any third parties.

SIGNED this 27th day of May, 2008.

ORLANDO L.  GARCIA
UNITED STATES DISTRICT JUDGE