UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| CITY OF SAN ANTONIO, TEXAS on behalf of itself and all other similarly situated Texas Cities, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. SA-06-CA-381-OG A CLASS ACTION |
| HOTELS.COM, et al., | § § § | |
| Defendants. | § | |

## DECLARATION OF STEVEN D. WOLENS IN SUPPORT OF PLAINTIFFS' APPLICATION FOR ATTORNEYS' FEES AND EXPENSES

I, STEVEN D. WOLENS, declare as follows:

1. I am a principal at the law firm of McKool Smith, P.C. ("McKool Smith"), which is Lead Counsel of record for the City of San Antonio ("Lead Plaintiff" or "City") in this Litigation ("Litigation").

2. I have been one of the City's attorneys in the Litigation since it was filed in May 2006. I am familiar with its proceedings over the past decade and have personal knowledge of the matters set forth herein based on my active supervision of and participation in all aspects of the case. I am submitting this Declaration in support of Plaintiffs' Motion and Memorandum of Law in Support of Attorneys' Fees, Costs, and Reimbursement of Expenses ("Application for Fees and Expenses") in connection with services rendered in this Litigation. This declaration is based on my personal knowledge. If called as a witness I could and would competently testify to the facts set forth herein.

I.  **QUALIFICATIONS**

3. I have practiced law since 1976. I received a B.A., with distinction, from Stanford University in 1973, and a J.D. from Southern Methodist University Law School in 1976. From 1987 – March 2007, I practiced law at Baron & Budd, P.C., in Dallas, Texas, during which time I was a shareholder. While there, I managed and litigated hundreds of mass tort cases in Ohio and Illinois and a substantial number in Texas, Missouri, Pennsylvania, and other states. From May 2007 to August 2008, I was a partner at the law firm of Diamond McCarthy LLP.

4. For 24 years, I served as a member of the Texas Legislature and authored many state laws and several constitutional amendments. *Texas Monthly* magazine named me one of the "Ten Best Legislators" in the state on six separate occasions.

5. I am licensed to practice law in the State of Texas (Bar No. 21847600) and to appear before the U.S. District Court for the Western District of Texas as well as the Eastern, Northern and Southern Districts of Texas, and the U.S. Court of Appeals for the Fifth Circuit. I am a member in good standing of these bars. I was recognized as a "Superlawyer" by *Texas Monthly* magazine in 2003 through 2013.

6. I have been substantially involved in litigation against the online travel companies ("OTC Litigation") since 2004.

7. In December 2004, I along with local co-counsel, filed the first suit on behalf of a government against the online travel companies ("OTCs"), alleging failure to properly remit transient occupancy taxes. That case, *City of Los Angeles, California, on behalf of itself and all others similarly situated v. Hotels.com, L.P., et al.*, Cause No. BC326693 ("L.A. Matter"), was filed as a class action on behalf of all California municipalities.

2

8. I have also participated as a lead counsel or co-counsel on behalf of other governmental entities against the OTCs including: *In the Matter of the Tax Appeal of Travelocity.com, LP*, T.A. No. 11-1-0021 and Consolidated Cases (Hawaii); *Expedia, Inc., et al. v. City of Portland, et al.*, No. 1202-02223; *Expedia, Inc. v. City and County of San Francisco, et al.*, Case No. CGC-13-535278; *City of San Diego v. Hotels.com, et al.*, Case No. GIC86117; *Priceline.com Inc. v. City of Anaheim, et al.*, No. B230457, and *Orbitz, LLC, et al. v. Broward County Florida, et al.*, Case No. 2009-CA-000126.

9. During the course of this Litigation, I have gathered further knowledge of the OTCs' business practices and data keeping, which has given me additional expertise in this matter.

10. In the OTC Litigation, I have had primary or substantial responsibility and involvement in developing the case both factually and legally, developing and maintaining client relations, drafting discovery, responding to discovery, and attempting to ensure the OTCs were not successful in their legislative efforts to secure legislative immunity for the claims brought against them.

## II. THE CITY'S FEE AGREEMENT WITH LEAD COUNSEL

11. Prior to April 21, 2006, I met with then-San Antonio City Attorney Michael Bernard and Deputy City Attorney Veronica Zertuche ("Zertuche") to discuss possible claims by the City of San Antonio, individually, and on behalf of a class of Texas cities, against the OTCs for their failure to pay hotel occupancy taxes.

12. On April 11, 2006, the City, acting through the Office of the City Attorney, entered into a Legal Services Agreement ("LSA") with Baron & Budd, P.C ("Baron & Budd") where I was then employed. It designated Baron & Budd as Special Counsel and Steven D.

Wolens ("I" or "Wolens"), and later, Gary Cruciani ("Cruciani") as Lead Counsel. I negotiated the LSA with City and signed it on behalf of Baron & Budd. The LSA was subsequently superseded and later amended on May 14, 2007, to include Diamond McCarthy LLP and Baron & Budd, P.C. (designating Diamond McCarthy as Special Counsel in place of Baron & Budd), and again on September 1, 2008, to include McKool Smith P.C. (designating McKool Smith as Special Counsel in place of Diamond McCarthy). The addition of Diamond McCarthy and later McKool Smith occurred when Wolens and Cruciani left Baron & Budd to join Diamond McCarthy and later when they left Diamond McCarthy to become principals at McKool Smith. In each instance, I signed the LSA on behalf of Diamond McCarthy and later McKool Smith. The following law firms, in addition to McKool Smith, have worked on this Litigation: Baron & Budd, P.C., Diamond McCarthy LLP, The Herrera Law Firm, and the Law Office of Trey Martinez Fischer. McKool Smith, along with the four other law firms, are collectively referred to as "Class Counsel."

13.    Even though the original April 11, 2006, LSA was superseded and amended, the contingency fee provision as well as all other substantive terms remained the same. Under the LSA with the City, Counsel is compensated on a contingency fee. Under those provisions:

> Compensation. The employment of Special Counsel will be on a contingency fee basis. Specifically, if Special Counsel is successful in obtaining and collecting a recovery for the City—whether by settlement, arbitration award, Court judgment or otherwise—Special Counsel will receive attorney's fees in the amount of Thirty Percent (30%) of the Gross Recovery ("Contingency Fee"). This fee is not set by law but is negotiable between the City and Special Counsel.
>
> The sole contingency upon which the City will pay compensation to Special Counsel is a recovery and collection on behalf of the City, whether by settlement, arbitration award, Court judgment or otherwise.

Thus under the LSA, Counsel is not paid unless there is a recovery made in the case.

14. The fee agreement was entered into as a result of arm's-length negotiations between Lead Counsel and the office of the City Attorney of the City of San Antonio.

15. When McKool Smith was retained by the City in this case, McKool Smith did not have a prior or ongoing attorney-client relationship with the City that would have caused the City to be more likely to retain McKool Smith in this litigation. McKool Smith did not agree to provide any services to the City on other matters at a lowered or discounted rate in order to be retained in this Litigation.

### III. COMMUNICATIONS WITH CITY

16. During the course of the Litigation over the past ten years, I provided the City with regular updates on the status of the Litigation, including written reports at least every three months that included, among other things, detailed descriptions of time dedicated to the case and details of expenses incurred. I regularly communicated with Ms. Zertuche, who was the primary individual with whom I communicated about the Litigation. From the time records I kept in connection with the Litigation, I can identify at least 269 days when I had at least one communication—either by phone or email with Ms. Zertuche. This does not include meetings we had in person.

### IV. COMMUNICATIONS WITH CLASS

17. Over the course of the Litigation, I regularly communicated with the class members to provide updates on the Litigation. My communications have been in two forms:

(a) GENERAL UPDATES: Since 2008, I have sent nine letters or emails to all the class members, informing them of new developments in the case or its status.[1]

---

[1] June 25, 2008 (regarding May 27, 2008 certification of class); May 21, 2009 (general update); July 7, 2011 (regarding July 1, 2011 issuance of Findings of Facts and Conclusions of Law); May 22, 2013 (general update);

5

(b) INDIVIDUAL COMMUNICATIONS: Since 2008, I have had individual communications with representatives of the class members, either by phone or email. Most often it was with city attorneys or staff who contacted me with specific inquires such as: (1) seeking updates on the Litigation so they could report to their city councils; (2) asking how much the City might expect to receive for purposes of their reporting at annual budget meetings; and (3) confirming the claim and representation for annual auditing purposes.

18. From 2008 to July 2016, I had at least 274 phone calls or email exchanges with individuals representing at least 107 cities. In all instances, I was responding to inquiries made by the representative of the class cities. This number does not include communications with the City of San Antonio.

## V. THE EXPENSES FOR WHICH LEAD PLAINTIFF SEEKS REIMBURSEMENT WERE REASONABLY INCURRED AND SHOULD BE REIMBURSED

19. Concurrently with this motion, Plaintiffs have filed a Bill of Costs seeking recovery of $319,384.73 in ordinary litigation costs under Fed. R. Civ. Pro. 54(d).[2]

20. Under the LSA, Special Counsel agreed to advance court costs and other expenses which the City agreed to reimburse from gross proceeds:

> Costs. It will be necessary for Special Counsel to incur and advance certain court costs and other types of expenses for the City. These Costs and other expenses may include, but are not limited to, the following: filing and service fees; costs of investigative services; travel expenses (including air fare, ground transportation, vehicle mileage, lodging and meals); deposition expenses and court reporters fees; outside trial services providers; trial equipment rental and operation fees; preparation of exhibits and graphics; the costs of briefs and transcripts on appeal, the miscellaneous copying, postage, shipping, and courier expenses.

---

September 29, 2015 and November 6, 2015 (status reports); February 10, 2016 (update on Court's January 22, 2016 rulings on post-judgment motions); April 20, 2016 (regarding Court entering Amended Final Judgment, enclosing Exhibit D indicating damages to each of the 173 class cities); and May 19, 2016 (regarding appeals and upcoming issues of attorney fees, bill of costs, and expenses).

[2] McKool Smith's part of this is $233,573.52.

> In addition, it will be necessary to employ expert witnesses and Special Counsel, with prior approval from the City, may employ and pay these expert witnesses, and such expenditures shall be included within Costs. Any single expense anticipated by Special Counsel that exceeds $15,000 shall require prior approval by the City, and said approval shall not be unreasonably withheld.
>
> The City agrees to reimburse Special Counsel for all reasonable Costs out of its share of the Gross Recovery, after the attorney's fee specified in paragraph 8 (or paragraph 13, if relevant) has been calculated and deducted. [LSA ¶ 10]

21.     During the period from September 2, 2008 through June 30, 2016, McKool Smith advanced out-of-pocket expenses for which it seeks reimbursement in the sum of $1,352,453.80. These expenses were reasonably and necessarily incurred in connection with the prosecution of the Litigation. These incurred expenses are reflected on the books and records of McKool Smith. Exhibit A hereto is McKool Smith's summary of expenses in connection with the prosecution of this Litigation. I have personally reviewed the bills and invoices, and the attached Exhibit A correctly and accurately sets forth the expenses for which reimbursement is sought per my review of this record. The individual bills and invoices are voluminous and cannot be conveniently examined in court. McKool Smith will make the originals or duplicates available for the Court's review upon request, or available for examination or copying, or both, by other parties at a reasonable time and place. None of these expenses have been reimbursed to date.

22.     A summary of the McKool Smith expenses reasonably incurred, is as follows:

| | |
|---|---|
| Communication Expenses | $42.80 |
| Courier Service | $9,719.12 |
| Court Reporter | $649.21 |
| Expert/Consultant | $925,075.80 |
| Filing Fee | $18.00 |
| In House Photocopies | $2,303.70 |
| Lexis On-Line Research | $40,992.03 |
| Meals | $14,336.98 |
| Mileage | $331.60 |
| Miscellaneous Legal Cost | $10,962.59 |

7

| | |
|---|---:|
| Office Supplies | $196.06 |
| Other Research | $373.98 |
| Outside Copy Services | $34,406.85 |
| Outside Services | $2,513.52 |
| Parking | $482.39 |
| Photocopies | $11,138.40 |
| Postage | $1,195.54 |
| Travel Expense | $154,340.34 |
| Westlaw On-Line Research | $143,374.89 |
| TOTAL: | $1,352,453.80 |

23.     The largest expense in the litigation was with Econ One Research, the firm retained by Plaintiffs to review, analyze, and report on the OTCs' transactional data. The lead expert was Dr. Jeffery Leitzinger. Dr. Leitzinger was deposed twice by the OTCs, and appeared in Court to present his live testimony twice: once at the class certification hearing on May 17, 2007, and again at trial on October 20, 2009.

24.     From November 2006 through June 2016, Econ One charged $863,000.00.[3] Approximately 29 percent of that amount was charged for August, September, and October 2009, the two months leading up to trial and the month of trial.

25.     The work performed by Dr. Leitzinger is more fully described in the Declaration of Dr. Jeffrey Leitzinger, included in the Application for Fees and Expenses.

## VI.     COMMUNICATIONS WITH EXPERT

26.     I was the attorney principally responsible for communicating with Econ One and Dr. Leitzinger. On a regular basis, I communicated with Don McCarthy, and later Alejandro Silva, both employees of Econ One.

27.     Our communications generally related to: (1) their analysis of the OTCs' data, their methodology to determine damages, and later, their calculations of taxes, penalties and

---

[3] This number includes charges incurred by McKool Smith, Diamond McCarthy, and Baron & Budd.

interest; (2) their providing expert reports necessary in the motion practice and for trial; (3) preparation for depositions and trial; and (4) joining me in meet-and-confer conferences with OTCs' counsel, Scott Siekierski, and sometimes with the OTCs' expert, to attempt to resolve differences in the data and reach a resolution on the differences in our respective analyses of taxes, interest, and penalties.

28. From the time records kept in the Litigation, I can identify at least 195 days when I had a least one phone call or email exchange with Econ One. Most often, there were multiple phone calls or email exchanges in a day. This does not include times when we met in person.

## VII. COMMUNICATIONS WITH OTCS' COUNSEL

29. During the course of the litigation, I had many conversations with OTCs' counsel regarding the transactional data provided by the OTCs.

30. While there were 11 different OTCs, Scott Siekierski was the principal attorney on behalf of the OTCs with whom I communicated regarding the data. Prior to the entry of the Court's Final Judgment on April 4, 2013 and the Amended Final Judgment on April 11, 2016, I had many conversations with Mr. Siekierski to resolve differences in our analysis of the data. Sometimes it was difficult. In most instances, we reached an agreement.

31. From the time records kept in the Litigation, I can identify at least 193 days when I had at least one phone call or email exchange with Mr. Siekierski. In addition to Mr. Siekierski, I had other communications with counsel for Travelocity, Orbitz, and Priceline regarding their particular data.

## VIII. EFFORTS TO DEFEAT OTC'S ATTEMPTS TO OBTAIN FEDERAL IMMUNITY

32. Since this case was filed, the OTCs have actively lobbied the U.S. Congress to pass legislation that would provide them immunity from all liability claims for underpayment of

hotel occupancy taxes in this Litigation as well as preclude governments from filing future claims. I have been actively involved in attempting to thwart their efforts.

33. The OTCs' legislative efforts were reported by the <u>Dow Jones Newswire</u> on January 28, 2010:

> Online travel booking firms including Orbitz Worldwide Inc. (OWW) and Expedia Inc. (EXPE) are asking Congress to resolve in their favor a legal dispute with cities and counties over hotel occupancy taxes.
>
> The online firms are seeking to add a provision to economic stimulus legislation pending in the U.S. Senate, that limits their exposure to taxes.[4]

34. Typical of the substantive changes sought that would have legislated away the Litigation was legislation creating a national standard for travel booking services. It provided, in part:

> (a) IN GENERAL.—A State or a political subdivision of a State may not levy or collect any occupancy tax or lodging fee, directly or indirectly, on travel booking or travel agency services provided by a travel agent or intermediary, regardless of the terminology used to describe the tax or fee or whether such tax or fee is imposed on a transaction or on a consumer, a travel agent or intermediary, or a provider of sleeping accommodations.
>
> (b) DEFINITIONS.—For purposes of this section—
>
> (1) OCCUPANCY TAX.—The term "occupancy tax" includes any tax imposed under the law of any State (or a political subdivision thereof) on a provider, travel agent or intermediary . . . .
>
> (3) TRAVEL BOOKING OR TRAVEL AGENCY SERVICES.— The term "travel booking or travel agency services" means any act—
>
> (A) which is performed by a travel agent or intermediary to facilitate the provision of sleeping accommodations between a provider of such accommodations and a consumer, and

---

[4] *See* http://www.advfn.com/nyse/StockNews.asp?stocknews=HOT&article=41304723, accessed 7/23/16.

> (4) FACILITATION FEE.—The term "facilitation fee"—
>
>> (A) includes all amounts charged or retained for travel booking or travel agency services, whether or not separately stated; and
>
> (5) TRAVEL AGENT OR INTERMEDIARY.—The term "travel agent or intermediary" means any entity which receives remuneration for facilitating the provision of sleeping accommodations and which is not in the trade or business of being a provider of sleeping accommodations.[5]

The enactment of this provision would have shut down the Litigation by excluding from occupancy tax the OTCs' margins and fees.

35. Another amendment would have prohibited a:

> State, or political subdivision of a State" from "levy (ing) or collect(ing) a tax or fee on amounts charged or retained from facilitating interstate booking of travel services, unless the tax or fee was finally assessed prior to the enactment of this subsection.[6]

Since San Antonio did not have a final assessment at the time the amendment was considered nor would have had finality to its claim by the time of its enactment, the amendment would have retroactively and prospectively ended the Litigation in its tracks.

36. I also followed the "Business Activity Tax Simplification Act" ("BATSA"). BATSA would have, among other things, required a person's physical presence in a state before any state could impose a tax and specifically would exempt from taxation "those business activities directly related to such person's potential or actual purchase of goods or services within the State if the final decision to purchase is made outside the State."[7]

---

[5] *See* http://www.ahla.com/uploadedFiles/AHLA/government_affairs/Legislative/OTC_Issue/Internet%20Booking%20Tax%20Amendment%20Draft%2012-09.pdf, accessed 7/23/16.
[6] *See* Plaintiff's Response to Defendants' Motion to Reconsider Order Denying Motion to Dismiss (Dkt. # 226, filed 9/18/07, fn 2 p. 1, Exhibit A).
[7] *See* H.R. 5267, 110th Congress, Second Session, Section 2.(a)(4)(4), https://www.congress.gov/bill/110th-congress/house-bill/5267/text, accessed 7/24/16; *see also* S. 3670 by Bunning, 110th Congress (2007-2008), https://www.congress.gov/bill/110th-congress/senate-bill/3670/text, accessed 7/24/16.

37.     In an effort to protect the class claim against the OTCs and thwart their efforts to get federal immunity from the claims made by the class, I sought to retain a lobbyist in Washington, D.C., to follow the OTCs' efforts to ensure they had no success in lobbying. In January 2009, I met with Martin Morris, a Senior Legislative Tax Consultant with extensive experience with Senate budget rules, tax legislation, and tax administration, who graduated cum laude with a J.D. from Wayne State University in 1976, was Tax Counsel to the Committee on the Budget for the United States Senate, and had served as Chief Director of Legislative Affairs for the Federation of Tax Administrators in Washington, D.C.

38.     Mr. Morris has monitored the OTCs' federal activities since January 27, 2009, to help ensure the OTCs do not succeed in getting immunity that would end this Litigation.

39.     Since September 17, 2008, during the course of this Litigation, I have communicated with Mr. Morris by email or phone calls at least 864 different times on at least 598 different days. This does not include meetings in person.

40.     In my efforts to attempt to prevent the OTCs' federal legislation from passing, I was also involved in soliciting the support of elected officials and organizations[8] representing cities, counties, and states to help us thwart the OTCs' lobbying efforts. I have attached as Exhibit 1, a sample of some of the letters I helped to coordinate from public officials and organizations to oppose the OTCs' efforts in Congress.[9]

---

[8] Those organizations with whom I was involved in coordinating efforts to oppose the OTCs included the National League of Cities, the National Association of Counties, the Government Finance Officers, the Federation of Tax Administrators, the American Federation of State, County, and Municipal Employees ("AFSCME"), the International Association of Fire Fighters, the American Federation of Teachers, and the National Education Association.

[9] *See* letters from City of Atlanta (January 26, 2009), letter from California Cities (August 5, 2009), letter from the City of San Francisco (March 26, 2010), Iowa Department of Revenue letter to Sen. Harkin (April 15, 2010), letter signed by 11 members of U.S. Senate to Max Baucus (June 28, 2010), letter from Sen. Orrin Hatch, to Max Baucus and Chuck Grassley (July 12, 2010), letter from National League of Cities, Government Finance Officers Association, et al. (January 27, 2010), letter from National Association of Counties (January 26, 2010), letter from AFSCME to Sen. Harkin (April 29, 2010), letter from American Hotel & Lodging Association, Latino Hotel

12

41.     The OTCs' lobbying activities were highlighted in a 2014 series of investigative pieces by The New York Times. In their lead front page story on October 28, 2014, writing about the political success of the law firm, Dickstein Shapiro ("Dickstein"), to influence Florida Attorney General Pam Bondi, the paper wrote:

> Perhaps the greatest victory in Florida for Dickstein relates to a lawsuit filed by Ms. Bondi's predecessor against online reservation companies, including Travelocity and Priceline, which Dickstein then represented, based on allegations that they were conspiring to improperly withhold taxes on hotel rooms booked in the state.[10]

The article continued to say the lawsuit "suddenly seemed to come to a halt," even though there were claims that Florida was losing $100 million a year. "Behind the scenes, Dickstein had been working to get the case dropped." Two months later, the Attorney General's office "moved to do what the firm had sought," and dismissed the case before the hearing.[11]

## IX.     EFFORTS IN TEXAS LEGISLATURE TO DERAIL LITIGATION

42.     In 2011, there was an effort in the Texas legislature to amend Section 156.001 of the Tax code to protect the OTCs margin and fees from application of the hotel occupancy tax.

43.     C.S.S.B. 1811 was a bill relating to certain state fiscal matters.[12] Floor Amendment No. ___, by Representative Chisum would have exempted the OTCs' margin and service fees from application of hotel occupancy taxes.[13] Specifically, the amendment excluded from the taxable price of a hotel room the:

---

Association, Destination Marketing Association International, et al. to U.S. Senate (June 24, 2010), and letter from Federation of Tax Administrators, Government Finance Officers Association, International City/County, et al., to Senator (September 4, 2009).
[10] New York Times October 28, 2014, http://www.nytimes.com/2014/10/29/us/lobbyists-bearing-gifts-pursue-attorneys-general.html?_r=0, accessed July 22, 2016.
[11] Id.
[12] See http://www.legis.state.tx.us/BillLookup/History.aspx?LegSess=82R&Bill=SB1811, accessed 7/23/16.
[13] See Floor Amendment No. ___ by Chisum, to amend C.S.S.B. No. 1811, attached as Exhibit 2. Exhibit 2 is what I understand to be a true and correct copy of the floor amendment as confirmed to me on the phone by Representative Chisum on May 18, 2011.

booking, handling facilitation, or similar fee or charge paid to an intermediary by or on behalf of a person, and any such charge shall be separately listed on the intermediary's bill, invoice or similar statement that is provided to the person who pays for the right to use or possess a room or space in a hotel.[14]

"Intermediary" means a person who is not an operator, but who sells or facilitates in any way the use or possession or the right to the use or possession of a room or space in a hotel, whether directly or indirectly, including a person who establishes the price paid for a room or space in a hotel.[15]

44. I spent over seven hours on May 18, 2011, explaining to the author of the amendment and four other lobbyists, among others, why the amendment would be harmful to the cities' claims against the OTCs in the Litigation. Had the amendment been adopted, and the bill passed, the damages in this Litigation would have ended on the effective date of the legislation, September 1, 2011.[16] The amendment was never offered nor further considered.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 25 day of July, 2016, at Dallas, Texas.

_____
STEVEN D. WOLENS
Texas Bar No. 21847600

---

[14] *Id.*, page 2, lines 9-14.
[15] *Id.*, page 1, lines 20-24.
[16] *See* http://www.capitol.state.tx.us/tlodocs/82R/billtext/pdf/SB01811E.pdf#navpanes=0, article 23, page 60, accessed 7/24/16.